UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SANDRA CURET,

      Plaintiff,

v.                                    Case No. 8:21-cv-1801-VMC-TGW

ULTA SALON, COSMETICS
& FRAGRANCE, INC.,

      Defendant.

_____/

## ORDER

      This matter comes before the Court upon consideration of Defendant Ulta Salon, Cosmetics & Fragrance, Inc.'s Motion for Summary Judgment (Doc. # 18), filed on May 10, 2022. Plaintiff Sandra Curet responded on June 6, 2022. (Doc. # 21). Ulta replied on June 20, 2022. (Doc. # 23). For the reasons that follow, the Motion is granted in part and denied in part.

## I.    Background

### A.    Ms. Curet's Employment with Ulta

      Sandra Curet began working at Ulta in its Orlando location in March 2013, where she was employed until April 2013. (Doc. # 18 at ¶ 1). On March 12, 2018, Ms. Curet applied to work as a Designer at Store 1096, Ulta's Brooksville

location. (Doc. # 18 at ¶¶ 4, 7). At that time, Meaghan Lanza was the General Manager of the store. (Id. at ¶ 8). Ms. Lanza interviewed Ms. Curet and made the final decision to hire Ms. Curet part-time as a Designer, which is a hair stylist position. (Id. at ¶¶ 9, 11-12). In April 2018, Ms. Lanza was promoted, and Tammy Parsons took over her role as General Manager of the Brooksville store. (Id. at 14). In approximately April 2019, Zan Oliva began working as the salon manager in the Brooksville store. (Doc. # 18-5 at ¶ 1).

Ms. Curet identifies as Black and Hispanic. (Doc. # 18 at ¶ 3). Ms. Curet's EEO activity began in March 2019, when she made a series of complaints to Ulta's ethics and compliance hotline. (Curet Depo. Doc. # 18-2 at 183:7-13). On March 4, 2019; April 11, 2019; May 30, 2019; June 30, 2019; August 27, 2019; and September 30, 2019, Ms. Curet made hotline complaints alleging race discrimination, harassment, and retaliation. (Doc. # 21-3 at 1; Doc. # 21-6 at 1; Doc. # 21-13 at 1; Doc. # 21-17 at 1; Doc. # 18-4 at ¶ 23; Doc. 18 at ¶ 24). Each time Ms. Curet made a complaint, with the exception of the September 30, 2019, complaint, Ms. Lanza met with her to investigate the concerns and address the issues she raised. (Curet Depo. Doc. # 18-2 at 238:17-239:18).

While Ms. Lanza was aware of Ms. Curet's hotline complaints, Ms. Curet's direct supervisors were not automatically informed. Ms. Curet has provided evidence that only Ms. Parsons and Ms. Oliva were, at any point during her employment, aware of her complaints. Specifically, as of April 12, 2019, Ms. Parsons was aware of Ms. Curet's hotline complaints. (Doc. # 21-2 at 2). In an April 12, 2019, meeting, Ms. Lanza sat down with Ms. Curet and Ms. Parsons to discuss Ms. Curet's complaints and ensured that both Ms. Curet and Ms. Parsons understood what retaliation meant. (Id.).

The parties dispute Ms. Oliva's awareness of Ms. Curet's hotline complaints. Ms. Oliva submitted a declaration stating she was "not aware of any complaints from Ms. Curet regarding any race discrimination, harassment, or retaliation while she was employed at Ulta." (Doc. # 18-5 at ¶ 2). However, in a June 5, 2019, meeting, Ms. Lanza sat down with Ms. Curet and Ms. Oliva to discuss Ms. Curet's concerns, focusing on Ms. Curet's issues with her schedule. (Doc. # 21-4 at 2). During this meeting, Ms. Lanza discussed the importance of clear communication and creating an environment where Ms. Curet felt comfortable voicing her concerns with Ms. Oliva. (Id.).

B.  **Cleaning Duties**

As part of their employment at Ulta, Ms. Curet and other salon employees were required to perform certain cleaning tasks, including sweeping and mopping the salon and restroom, when they closed the store for the day. (Doc. # 18-3 at ¶¶ 7, 10; Doc. # 18-4 at ¶ 14-15). Similarly, the closing employee was responsible for gathering trash from the salon every other day. (Doc. # 18-3 at ¶¶ 7, 10; Doc. # 18-4 at ¶ 14). Employees other than Ms. Curet were required to take out salon trash as part of this rotation. (Doc. # 18-3 at ¶ 11). On March 2, 2019, one of Ms. Curet's managers asked her to take out the bathroom trash. (Curet Dep. Doc. # 18-2 at 208:3-8; Doc. # 21-13 at 1). Ms. Curet was asked to do this prior to her clocking out at 7:00 pm, even though the store did not close until 9:00 pm. (Doc. # 21-14).

According to Ms. Curet, in addition to these basic cleaning tasks, Ms. Oliva instructed her to "clean bathroom toilets and collect bathroom waste." (Doc. # 1 at ¶ 31). On four occasions, Ms. Curet was asked to clean the restroom, even though cleaning the restroom was the responsibility of the store managers. (Curet Depo. Doc. # 18-2 at 204:10-13, 205:1-7). On one occasion, Ms. Oliva asked Ms. Curet to clean the bathroom toilet – a task outside the job responsibilities

4

of a stylist – even though Ms. Curet had never seen any employee perform either task or be asked to perform either task. (Doc. # 21-10 at ¶ 2-5; Curet Dep. Doc. # 18-2 at 199:19-22, 208:25-209:3).

During their respective tenures as General Manager, both Ms. Lanza and Ms. Parsons personally cleaned the restroom, including the restroom toilet. (Doc. # 18-3 at ¶ 9; Doc. # 18-4 at ¶ 13). Ms. Lanza additionally stated that she asked other employees, including Cerissa Poleman, who was white and not Hispanic, to clean the toilet as necessary. (Doc. # 18-4 at ¶ 13). Ms. Curet additionally acknowledges that it was possible that the store managers asked other employees to clean the restroom. (Curet Depo. Doc. # 18-2 at 205:14-17).

### C.   Ms. Curet's Scheduling Issues

Beginning in August 2018, Ms. Curet began to have issues with the consistency of her scheduling. (Id. at 182:3-9). These issues persisted into 2019. (Id. at 185:12-19). Ms. Curet had told her managers that she was willing to work on Thursdays, Fridays, and Saturdays. (Id. at 171:7-9). While Ms. Curet once had a "stable" schedule, Ms. Parsons began to "move [her] schedule around." (Id. at 172:1-7, 210:1-2).

Because of her inconsistent schedule, Ms. Curet struggled to maintain the 60 percent client retention rate

that Ulta requested. (Id. at 189:5-13). When Ms. Curet voiced her concerns about her scheduling, her managers informed her she could work "any day or time she wants as long as she's productive" once she "fill[s] her existing scheduled shifts 100%." (Doc. # 21-2 at 3). Ms. Curet understood when she began working at Ulta in 2013 that it was industry standard for stylists who did not have customers to have their hours reduced. (Curet Depo. Doc. # 18-2 at 100:18-101:13).

Additionally, Ms. Curet's managers did not provide her with the number of customers that Ms. Curet thought sufficient to build her own client base. (Id. at 187:9-20). According to Ulta policy, stylists in their first year on the job have priority when it comes to new customers in order to build their client base. (Id. at 180:8-16). However, during Ms. Curet's first year, between April 2018 and February 2019, management at Ulta did not help her build her client book. (Id. at 181:4-12). Similarly, in early March 2019, Ms. Curet's managers made "facial expressions" at Ms. Curet's clients when they were in her chair, prompting them to feel uncomfortable. (Doc. # 21-13 at 1).

Beginning in 2019, Ms. Lanza began working with stores under her supervision to focus on labor costs and to try and reduce unproductive hours. (Doc. # 18-4 at ¶ 10). As part of

6

this initiative, Ms. Lanza and other members of management would ask employees who were not actively providing services and who lacked other scheduled appointments to end their shift early. (Id.). In addition to Ms. Curet, members outside of Ms. Curet's protected classes were asked to end their shifts early when they did not have appointments. (Doc. # 18-3 at ¶ 6).

Around the same time, in March 2019, Ms. Parsons was looking to hire more stylists. (Doc. # 21-1 at 4). The need to staff the store on Sundays – a day which Ms. Curet indicated she was unavailable to work – motivated the potential hiring of new stylists. (Id. at 3-4; Curet Depo. Doc. # 18-2 at 147:5-9).

In early April 2019, despite her willingness to work Saturdays, Ms. Curet's Saturday shifts were moved or eliminated. (Doc. # 21-6 at 1). Ms. Curet preferred to work the Saturday shifts because of the high customer traffic on Saturdays, which gave her the chance to either answer the phone to fill her book or take walk-in clients. (Curet Depo. Doc. # 18-2 at 146:23-147-2, 228:19-21; Doc. # 21-2 at 2). Ms. Parsons informed Ms. Curet that her hours were being reduced because of her low productivity. (Doc. # 21-6 at 1). This schedule change prompted Ms. Curet to make an ethics

7

complaint to Ulta's hotline on April 11, 2019. (Id.). At the time of the complaint, Ms. Parsons had been assigned to work 3:00 to 9:00 pm on Saturdays. (Doc. # 21-2 at 3). However, following Ms. Curet's complaint to HR, Ms. Lanza and Ms. Curet worked out a schedule where Ms. Curet was assigned to work from 10:00 am to 3:00 pm on Saturdays. (Id.).

     **D.**   **The Written Warnings**

In August and September 2019, Ms. Curet was issued three written warnings by salon management. The first occurred on August 3, when Ms. Curet was given a warning for using her telephone in the salon. (Doc. # 21-16 at 1). The second occurred on August 17, when Ms. Curet was asked to leave prior to her shift ending. (Id. at 2). Ms. Curet's shift was not scheduled to end until 2:00 pm, but because her only appointment for the day was at 11:00 am, Ms. Oliva asked her to leave at 1:15 pm. (Id.). Ms. Curet did not want to leave because doing so would mean she was unable to service walk-in customers, so she refused when Ms. Oliva asked her to go home. (Id.). Ms. Curet only left after Ms. Lanza called the store to tell her to leave, resulting in Ms. Oliva issuing a written warning. (Id.).

On September 14, 2019, Ms. Oliva and Ms. Parsons, with Ms. Lanza's approval, placed Ms. Curet on a final written

warning in Ulta's system. (Doc. # 18-4 at ¶ 12). Ms. Parsons and Ms. Lanza explained this was because of "insubordinate conduct." (Id.). The day before, on September 13, Ms. Oliva and Ms. Curet were involved in a disagreement over mopping the floor. (Curet Depo. Doc. # 18-2 at 257:4-6). Ms. Oliva asked Ms. Curet to mop the floor, and Ms. Curet sprayed water from the shampoo bowl on the floor. (Id.). Ms. Oliva asked Ms. Curet to instead mop with the mop bucket, but Ms. Curet responded that if Ms. Oliva did not like the way Ms. Curet mopped, Ms. Curet could do another task instead. (Id. at 258:1-4). Ms. Oliva consulted with another manager, Carla Lackey, who informed Ms. Oliva that if an employee refused to perform certain duties, she could be assigned different duties to perform instead. (Id. at 257:12-17). Ms. Curet's refusal to mop the floors led Ms. Oliva to issue a written warning, where Ms. Oliva explained that Ms. Curet had refused to perform the job as required of a closing employee. (Doc. # 21-7 at 1). However, on that day, Ms. Curet clocked out at 6:44 pm, and the store did not close until 9:00 pm. (Doc. # 21-8).

On September 18, 2019, Ms. Oliva reprimanded Ms. Curet over her use of Keratin, a hair product she used in her services, while Ms. Curet was treating a client. (Id. at

261:8–10). While Ms. Curet was performing a Keratin treatment, Ms. Oliva informed her that she was pouring too much Keratin and wasting the product. (Id. at 261:13–25). Per Ms. Curet's training on Keratin use, stylists were supposed to begin with two ounces of the product, but the amount ultimately used depended on the client's hair. (Id. at 3–6). A client with thick hair would therefore require more Keratin and would be charged more to reflect the use of additional product. (Id. at 15–19).

During the treatment at issue, Ms. Curet does not recall the amount she initially used on the client but ended up pouring an additional five-and-a-half ounces of product into the bowl. (Id. at 263:9–12). Although there was a scale for stylists to measure product, Ms. Curet was able to assess how much product she was using without using the scale because there were small measuring lines inside the bowl. (Id. at 262:22–263:8). While Ms. Curet did not end up using the additional Keratin on the client, she explained that the product is reusable and so she did not waste it. (Id. at 261:24–262:2). Ms. Oliva took the leftover Keratin, but Ms. Curet did not know whether Ms. Oliva drained the product or put it back in the bottle after removing it from Ms. Curet's workspace. (Id. at 264:11–18).

After removing the Keratin, Ms. Oliva took Ms. Curet to the break room to discuss the incident with Ms. Parsons. (Id. at 270:6-8). Ms. Parsons walked in on the conversation after returning from lunch and recalled that Ms. Curet was speaking to Ms. Oliva loudly. (Doc. # 18-3 at ¶ 13-14). Ms. Curet does not remember whether she raised her voice but admitted that it was possible that she did. (Curet Depo. Doc. # 18-2 at 270:18-23). Ms. Curet later stated in a declaration that she did not speak loudly. (Doc. # 21-10 at ¶ 13).

Ms. Parsons recalled that after she asked Ms. Curet to provide her with her version of events, Ms. Curet slammed her hands down on the table. (Doc. # 18-3 at ¶ 15). Ms. Curet stated that she was irritated with Ms. Oliva for pulling her away from a client while she was in the process of providing services but was not aggravated. (Curet Depo. Doc. # 18-2 at 271:21-272:5).

**E.   Ms. Curet's Termination**

After the meeting where Ms. Curet slammed her hands down on the table, Ms. Lanza received a report from Ms. Parsons detailing the events of the meeting. (Doc. # 18-4 at ¶). Ms. Lanza worked with Emma Leliefeld, an employee in Ulta's Human Resources department, to determine the appropriate response to Ms. Curet's conduct. (Id.). Ms. Lanza also reviewed the

11

video footage of the meeting and obtained a statement from Ms. Oliva to verify Ms. Parsons' account. (Id.). Following Ms. Lanza's investigation of the meeting, on or before September 27, 2019, Ms. Lanza made the decision to terminate Ms. Curet's employment. (Id. at ¶ 20). Ms. Lanza's decision to terminate Ms. Curet was based on the September 18, 2019, incident. (Id. at 24).

Ms. Curet was not terminated until October 4, 2019. (Id. at ¶ 22). Because of the events of the September 18 meeting, Ms. Lanza felt it would be best if she, rather than Ms. Parsons, informed Ms. Curet that her employment was terminated. (Id. at ¶ 21). However, Ms. Lanza was taking personal time off during the period directly following her decision to terminate Ms. Curet and was not able to visit the store until October 4. (Id. at ¶ 22). When Ms. Lanza returned on October 4, she terminated Ms. Curet's employment. (Id. at ¶ 24).

Ms. Curet initiated this action against Ulta on July 26, 2021, asserting claims of retaliation in violation of Title VII (Counts I and II) and race discrimination under Title VII (Count III). (Doc. # 1). On May 10, 2022, Ulta moved for summary judgment on all claims. (Doc. # 18). Ms. Curet has

12

responded (Doc. # 21) and Ulta has replied. (Doc. # 23). Ulta's Motion is now ripe for review.

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

III. **Analysis**

In its reply to Ms. Curet's response to the Motion for Summary Judgment, Ulta argues that the declaration that Ms. Curet submitted following her deposition testimony is, to the extent that it conflicts with that testimony, a sham affidavit and that the Court should not consider it for the purposes of summary judgment. (Doc. # 23 at 2). Because resolution of this issue is necessary for the Court to assess Ulta's Motion, the Court will first address Ulta's contention that Ms. Curet's declaration is a sham affidavit. The Court will then address Ulta's Motion on all three counts alleged in Ms. Curet's complaint.

A.    **Sham Affidavit**

When considering a motion for summary judgment, the Court must consider all proffered evidence and cannot disregard an affidavit simply because it conflicts with a deposition. See Kennett-Murray Corp. v. Bone, 622 F.2d 887, 892-93 (5th Cir. 1980) (stating that district courts must not resolve factual disputes by weighing conflicting evidence; doing so is within the province of the jury). However, the Court may strike any affidavit it considers a "sham-affidavit." Van T. Junkins and Assoc. v. U.S. Indus., 736 F.2d 656, 656-57 (11th Cir. 1984). A sham affidavit is

defined as an affidavit given and submitted for the sole purpose of creating a factual dispute where it is clear through previous deposition testimony that one does not exist. Id. at 659.

The "sham affidavit rule should be applied sparingly." Kernel Records Oy v. Mosley, 694 F.3d 1294, 1303 n.6 (11th Cir. 2012) (citing Latimer v. Roaring Toyz, Inc., 601 F.3d 1224, 1237 (11th Cir. 2010)). In order to strike an affidavit as a sham, the Court "must find 'some inherent inconsistency' between an affidavit and the affiant's sworn testimony." Mortg. Payment Prot., Inc. v. Cynosure Fin., Inc., No. 6:08-cv-1212-ACC-GJK, 2011 WL 2670081, at *4 (M.D. Fla. July 8, 2011) (quoting Tippens v. Celotex Corp., 805 F.2d 949, 954 (11th Cir. 1986)). Courts may only disregard an affidavit that "contradicts, without explanation, previously given clear testimony." Lane v. Celotex Corp., 782 F.2d 1526, 1532 (11th Cir. 1986) (citing Van T. Junkins, 736 F.2d at 657). It is not sufficient for a statement in an affidavit to merely be at odds with deposition testimony previously given. Bone, 622 F.2d at 894.

Here, beginning with the purported conflict over whether Ms. Curet raised her voice, the deposition testimony and her subsequent declaration are not inherently inconsistent. While

16

Ms. Curet stated in her deposition that it was possible she raised her voice although she did not remember, she stated in her declaration that she did not speak loudly. (Doc. # 21-10 at ¶ 13). Ms. Curet's deposition testimony is thus neither clear nor unequivocal as to whether she raised her voice. Ms. Curet neither admitted nor denied whether she raised her voice; rather, she expressed a lack of memory. See Tippens v. Celotex Corp., 805 F.2d 949, 953-54 (11th Cir. 1986) ("To allow every failure of memory or variation in a witness' testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the . . . affiant . . . was stating the truth."). The Court thus will not disregard this portion of Ms. Curet's declaration.

However, Ms. Curet clearly and unequivocally admitted that she slammed her hands down on the table. (Doc. # 18-2 at 271:17-19). During her deposition, Ms. Curet was asked twice if she slammed her hands down on the table during the September 18, 2019, meeting, to which she responded "[y]es" both times. (Id. at 271:17-272:9). Although Ms. Curet stated in her declaration that she did not slam her hands down on the table, her deposition testimony constitutes "clear

answers to unambiguous questions which negate the existence of any genuine issue of material fact." Van T. Junkins, 736 F.2d at 657. Because Ms. Curet's subsequent declaration "merely contradicts, without explanation, previously given clear testimony," the Court will disregard the portions of her declaration that pertain to whether she slammed her hands on the table during the September 18 meeting. Id.

### B.    Count I — Retaliatory Hostile Work Environment

Title VII of the Civil Rights Act prohibits retaliation against any employee who "has opposed any practice made an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, a plaintiff must show: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse employment action; and (3) there is a causal link between the adverse action and the protected activity. Lucas v. W.W. Grainger, 257 F.3d 1249, 1260 (11th Cir. 2001).

Retaliatory hostile work environment claims are analyzed under the same standard as retaliation claims and "prevail if the conduct complained of 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Tonkyro v. Sec'y, Dep't of Veterans Affs., 995 F.3d 828, 836 (11th Cir. 2021) (quoting Monaghan v.

18

Worldpay U.S. Inc., 955 F.3d 855, 862 (11th Cir. 2020)).
However, unlike Title VII retaliation claims, which are based
on discrete acts, the "very nature" of a hostile work
environment claim "involves repeated conduct." Nat'l R.R.
Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002). Hostile
work environment claims are based on the "cumulative effect
of individual acts," each of which "may not be actionable on
its own." Id. Courts thus treat the "series of separate acts"
comprising a retaliatory hostile work environment claim as
"one unlawful employment practice." Id. at 103 (internal
quotations omitted).

In addition, a plaintiff must demonstrate a link between
her EEO activity and the totality of events allegedly creating
a hostile work environment. See Terrell v. McDonough, No.
8:20-cv-64-WFJ-AEP, 2021 WL 4502795, at *9 (M.D. Fla. Oct. 1,
2021) (rejecting plaintiff's retaliatory hostile work
environment claim where she failed to link the allegedly
adverse actions to her EEO activity). Courts construe the
causation element "broadly" and "a plaintiff need only
demonstrate 'that the protected activity and the adverse
action were not wholly unrelated.'" Debe v. State Farm Mut.
Auto. Ins., 860 F. App'x 637, 639 (11th Cir. 2021) (citing
Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1180 n.30

(11th Cir. 2003)). To do so, however, "[t]he plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action." Id.

"Once a plaintiff has established a prima facie case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action." Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2016). The plaintiff must then prove the employer's provided reason is pretextual – that is, that the protected activity was the but-for cause of the adverse employment action. Pennington v. City of Huntsville, 262 F.3d 1262, 1266 (11th Cir. 2001); see Gogel v. Kia Motors Mfg. of Ga., Inc., 967 F.3d 1121, 1190 n.13 (11th Cir. 2020) (applying the but-for causation test at the pretext stage of the summary judgment examination rather than applying it to the plaintiff's prima facie case).

Ms. Curet alleges that she suffered an adverse employment action in the form of ongoing harassment comprised of multiple disciplinary warnings, arbitrary assignment of cleaning duties, reduction in work hours, modification of her schedules, diversion of clients, and scrutiny of her work by management. (Doc. # 21 at 18–19).

As a threshold matter, the only events that could feasibly form the basis of Ms. Curet's retaliatory hostile work environment claim are those that Ms. Parsons and Ms. Oliva participated in, and only after each of them became aware of Ms. Curet's EEO activity. Viewed in the light most favorable to Ms. Curet, the evidence supports an inference that Ms. Parsons became aware of Ms. Curet's EEO activity on or before April 12, 2019, and Ms. Oliva became aware of Ms. Curet's EEO activity on or before June 5, 2019. Thus, the only events that can form the basis of Ms. Curet's retaliatory hostile work environment claim are the August 17, 2019, incident where Ms. Oliva asked Ms. Curet to leave prior to the end of her scheduled shift and the subsequent write-up, the September 13, 2019, incident during which Ms. Oliva asked Ms. Curet to mop the floors and the subsequent write-up, and the September 18, 2019, incident during which Ms. Parsons reprimanded Ms. Curet over the Keratin use and the subsequent write-up.

Here, these three events, taken together, constitute a materially adverse employment action. All three of these events resulted in written disciplinary warnings from Ms. Curet's managers. A reasonable jury could find that the issuance of three written warnings in less than a month's

21

time "well might have dissuaded a reasonable worker from
making or supporting a charge of discrimination." Monaghan,
955 F.3d at 862; see also Hyde v. Storelink Retail Grp., Inc.,
No. 8:07-cv-240-JSM-MAP, 2009 WL 259392, at *4 (M.D. Fla.
Feb. 3, 2009) (explaining a reasonable jury could find that
written warnings constituted materially adverse employment
actions in the retaliation context).

### 1.   Causation

Ms. Curet must still demonstrate a causal connection
between her EEO activity and the alleged harassment. A
plaintiff can establish a causal connection by showing a close
temporal proximity between her employer's discovery of the
protected activity and the adverse action, but the temporal
proximity must be "very close." Thomas v. Dejoy, No. 5:19-
cv-549-TKW-MJF, 2021 WL 4992892, at *10 (N.D. Fla. July 19,
2021). "A three-to-four-month delay is too long, while a one-
month gap may satisfy the test." Debe, 860 F. App'x at 639
(internal citations omitted). For example, a district court
found causation where "numerous adverse events . . . occurred
within weeks after *each* of [the plaintiff's] protected acts."
Norman v. McDonough, No. 2:20-cv-01765-KOB, 2022 WL 3007595,
at *9 (N.D. Ala. July 28, 2022).

Here, a reasonable jury could find that the temporal proximity between Ms. Oliva and Ms. Parsons' knowledge of Ms. Curet's protected activity and the adverse employment actions supports an inference of causation. The Court treats the events forming the basis of Ms. Curet's retaliatory hostile work environment claim as one adverse employment action, which began on August 17, 2019. (Doc. # 21-16 at 2). Ms. Oliva became aware of Ms. Curet's protected activity on or before June 5, 2019, and issued a written warning after asking her to leave her shift early a little over two months later. (Id.; Doc. # 21-4 at 2). The short period between Ms. Oliva's knowledge and the beginning of the adverse action evinces the two were not "wholly unrelated." Debe, 860 F. App'x at 639.

### 2.   **Ulta's Legitimate Business Reasons**

If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged action. EEOC v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002).

Here, Ulta has provided reasons it contends are non-retaliatory for each event comprising Ms. Curet's retaliatory hostile work environment claim. With respect to Ms. Oliva's August 17, 2019, writeup, Ms. Oliva issued a written warning

when Ms. Curet refused to leave despite being asked to do so. (Doc. # 21-16 at 2). While Ms. Curet contends that she was improperly asked to leave before her shift was scheduled to end, Ulta has explained that the practice at the time was for employees to leave if they were not productive. (Doc. # 18-4 at ¶ 10). On the date in question, Ms. Curet had finished her scheduled appointment, and was not serving any clients when Ms. Oliva asked her to leave. (Doc. # 21-16 at 2). Indeed, managers had also asked employees other than Ms. Curet to leave early when they did not have any appointments. (Doc. # 18-4 at ¶ 6).

Similarly, Ms. Oliva's September 13, 2019, written warning was in response to Ms. Curet's refusal to mop the floor. (Doc. # 18-4 at ¶ 12). While Ms. Curet quibbles with the details of whether Ms. Oliva asked her to mop with the bucket before or after she began cleaning, she does not dispute that after Ms. Oliva asked her to mop the floors in a certain way, she refused to do so. (Curet Depo. Doc. # 18-2 at 257:4-258:8). As Ms. Oliva explained, she placed Ms. Curet on the final written warning because of her refusal to mop despite doing so being part of Ulta's closing procedures. (Doc. # 21-7 at 1).

24

Finally, Ulta explained that Ms. Oliva's September 18, 2019, reprimand of Ms. Curet was in response to Ms. Curet's improper use of Keratin. (Doc. # 18 at 19). Ms. Curet had been trained on Ulta's policy regarding the proper use of Keratin, which provided that stylists were supposed to start with two ounces of Keratin. (Curet Depo. Doc. # 18-2 at 264:6–11). However, Ms. Curet poured five-and-a-half ounces of the product into a bowl, and did not use the scale to measure the Keratin. (Id. at 263:10–17). Ulta has thus provided evidence that the overuse of Keratin, not retaliation, prompted Ms. Oliva to take Ms. Curet into the break room to discuss the incident with Ms. Parsons.

Ulta has therefore provided non-retaliatory reasons for each of the events underlying Ms. Curet's retaliatory hostile work environment claim.

### 3.   **Pretext**

Because Ulta has provided non-retaliatory reasons for Ms. Curet's adverse employment actions, the burden shifts to Ms. Curet to demonstrate that the proffered reason were pretextual. Barber v. Cellco P'ship, 808 F. App'x 929, 934 (11th Cir. 2020). As part of this burden, Ms. Curet must provide evidence supporting an inference that her protected activity was the "but-for" cause of the adverse action by the

employer. <u>Univ. of Tex. Sw. Med. Ctr v. Nassar</u>, 570 U.S. 338, 362 (2013); <u>see</u> <u>also</u> <u>Gogel</u>, 967 F.3d at 1136 ("[I]n determining whether the plaintiff has met her burden to show pretext, we remain mindful that it is the plaintiff's burden to provide evidence from which one could reasonably conclude that but for her alleged protected act, her employer would not have fired her.").

"To show pretext, an employee must demonstrate 'such weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" <u>Jackson v. Blue Bird Corp.</u>, 792 F. App'x 706, 713 (11th Cir. 2019) (quoting <u>McCann v. Tillman</u>, 526 F.3d 1370, 1375 (11th Cir. 2008)). "A reason is pretextual only if it is false and the true reason for the decision is retaliatory." <u>Dugandzic v. Nike, Inc.</u>, 807 F. App'x 971, 976 (11th Cir. 2020). However, "[w]hereas the question of causation in a discrete action claim focuses singularly on the but-for cause of each employment action, the question in a hostile environment case is more holistic, focusing on whether the protected activity was the but-for cause of the harassing environment." <u>Carney v. City of Dothan</u>, 158 F. Supp. 3d 1263, 1289 (M.D. Ala. 2016).

Here, considering them together, a reasonable jury could find Ulta's preferred explanations for the events underlying Ms. Curet's retaliatory hostile work environment claim unworthy of credence. With respect to the September 13 warning, Ulta explains that Ms. Curet was written up because she refused to mop despite that being a responsibility of the closing employee. (Doc. # 21-7 at 1). But according to Ms. Curet's time records for that day, her shift ended at 6:44 pm, creating a dispute as to whether she was in fact the closing employee. (Doc. # 21-8). While asking Ms. Curet to mop the floor does not by itself support an inference of a retaliatory motive, that Ulta's proffered reason for the written warning conflicts with Ms. Curet's account casts doubt on the true reason for the warning.

Similarly, Ulta explains that Ms. Curet's overuse of Keratin prompted Ms. Oliva to reprimand her and remove her from the floor on September 18. (Doc. # 18 at 19). Although Ms. Curet admits to pouring more than two ounces of Keratin, she also explained that the amount of Keratin a stylist used is based on the individual client's hair. (Curet Depo. Doc. # 18-2 at 262:15-263:12). There thus exists a factual dispute over whether Ms. Curet acted in a manner that would justify

Ms. Oliva reprimanding her, calling Ulta's proffered reason into question.

True, there is no evidence that retaliation motivated the August 17, 2019, warning insofar as other employees were also asked to leave their shifts early. (Doc. # 18-3 at ¶ 6). But viewing the individual events as one adverse employment event, a reasonable jury could find retaliation was the but-for cause of the harassing environment. See Carney, 158 F. Supp. 3d at 1289 (explaining that a plaintiff must show that retaliation was the but-for cause of the harassing environment in a retaliatory hostile work environment case). Thus, even though Ulta has provided a non-retaliatory reason behind every individual event, Ms. Curet has presented evidence that calls the legitimacy of these explanations into question. Viewed together, Ulta's tenuous explanations for each of the events forming the basis of Ms. Curet's hostile work environment claim create a factual dispute as to whether these reasons were the real reasons for the adverse employment actions.

### C.   Count II — Retaliation

Ms. Curet also alleges that her termination was in retaliation for her EEO activity in violation of Title VII. (Doc. # 21 at 18-19). Ms. Curet does not separate out her

retaliation and retaliatory hostile work environment claims into two separate counts in her response to Ulta's Motion. (Doc. # 21 at 18). However, because she characterized the alleged adverse employment actions other than her termination as "ongoing harassment," the Court considered these events only as part of her retaliatory hostile work environment claim. (Id.). Retaliation claims based on discrete acts differ from retaliatory hostile work environment claims in that "the question of causation . . . focuses singularly on the but-for cause of each employment action[.]" Carney, 158 F. Supp. 3d at 1289.

For the purposes of its summary judgment Motion, Ulta does not contest that Ms. Curet can meet the first two elements of the prima facie case for her retaliation claim. (Doc. # 18 at 17). However, Ulta argues that Ms. Curet cannot establish a causal link between her protected activity and her termination, and that even if she could, Ms. Curet's managers had non-retaliatory, non-pretextual reasons for her termination. (Id.).

### 1.   **Causation**

As discussed, a plaintiff can show a causal connection by demonstrating a close temporal proximity between the time her employer became aware of her protected activity and the

adverse action, but the temporal proximity must be "very close." <u>Thomas</u>, 2021 WL 4992892, at *10.

Here, the short time between Ms. Curet's August 27, 2019, complaint and her October 4, 2019, termination suggests a connection between Ms. Curet's EEO activity and the subsequent adverse employment outcomes. <u>See</u> <u>Debe</u>, 860 F. App'x at 639 (explaining close temporal proximity can establish protected activity and adverse action were not "wholly unrelated"). Ms. Curet made a complaint to Ulta's hotline on August 27, 2019, alleging Ms. Oliva discriminated against Ms. Curet by altering her schedule. (Doc. # 21-17 at 1). After investigating the September 18, 2019, meeting between Ms. Curet, Ms. Oliva, and Ms. Parsons regarding Ms. Curet's Keratin use, Ms. Lanza and Ms. Leliefeld determined that Curet's employment should be terminated on or before September 27, 2019. (Doc. # 18-4 at ¶ 20). Ms. Lanza and Ms. Leliefeld informed Ms. Curet of the decision on October 4, 2019. (<u>Id.</u> at ¶ 24).

A reasonable jury could thus find from the close proximity between Ms. Curet's protected activity and her termination that the two events were related. <u>See</u> <u>Dixon v. DTA Sec. Servs.</u>, No. 20-12040, 2021 WL 5320987, at *4 (11th Cir. Nov. 16, 2021) (finding a six-week period between when

an employer discovered an employee's protected activity and the employer's decision to terminate that employee sufficient to support an inference of causation). Ms. Curet has thus established a prima facie case of retaliation.

## 2.   **Ulta's Legitimate Business Reasons**

Again, if the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged action. Joe's Stone Crabs, Inc., 296 F.3d at 1272. Where the employer meets its burden, "then the plaintiff, in order to survive the motion for summary judgment, must show that the reasons proffered by the defendant were not the true ones, but were more likely pretexts for retaliation." Dugandzic, 807 F. App'x at 976.

Here, Ulta contends that Ms. Curet's increasingly insubordinate behavior, which culminated in the September 18, 2019, meeting, motivated her termination. (Doc. # 18 at 21). Ms. Lanza explained that she received a report from Ms. Parsons that, during a coaching session, Ms. Curet had slammed her hands down on the table. (Doc. # 18-4 at ¶ 18). After reviewing the video footage to confirm that Ms. Curet had slammed her hands down on the table, and obtaining a statement from Ms. Oliva, Ms. Lanza discussed the incident with Ms.

31

Parsons and Ms. Leliefeld, and made the decision to terminate Ms. Curet's employment. (<u>Id.</u> at ¶ 19-20). Ms. Curet's behavior during the September 18 meeting thus constitutes a non-retaliatory basis for her termination. <u>See</u> <u>Frazier v. Sec'y, Dep't of Health and Human Servs.,</u> 710 F. App'x 864, 871 (11th Cir. 2017) (finding "instances of disrespect for authority and failure to follow instructions" sufficient non-retaliatory reasons for termination).

### 3.   **Pretext**

Like with Ms. Curet's retaliatory hostile work environment claim, the burden shifts to Ms. Curet to demonstrate that the proffered reason was pretextual because Ulta has provided a non-retaliatory reason for Ms. Curet's termination. <u>Barber</u>, 808 F. App'x at 934.

While Ms. Curet states that Ulta's "stated reasons for termination are pretextual," she has not provided any evidence in support of that assertion. (Doc. # 21 at 19). Indeed, Ms. Curet admitted in her deposition that she slammed her hands down on the table during the meeting.

Even if a factual dispute as to the September 18, 2019, meeting existed, Ms. Lanza based her termination on the reports of Ms. Oliva and Ms. Parsons and corroborated the reports by reviewing security footage. This she was entitled

to do. See Gogel, 967 F.3d at 1148 (explaining that an employer's good-faith belief of employee misconduct was sufficient to support termination); Frazier, 710 F. App'x at 871 ("But even if [Plaintiff] established that the instances themselves were false or exaggerated, that alone would be insufficient to show pretext 'without calling into question [the decision maker's] sincere belief that they occurred." (citing Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 769 (11th Cir. 2005))).

Because Ms. Curet has not "demonstrate[d] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence," she has failed to meet her burden of providing evidence upon which a reasonable jury could find that a retaliatory animus was the but-for cause of her termination. Jackson, 792 F. App'x at 713.

### 4. **Convincing Mosaic**

In addition to arguing that her termination was retaliatory under the McDonnell Douglas framework, Ms. Curet also attempts to apply the "convincing mosaic" theory to her retaliation claim. (Doc. # 21 at 9). As an initial matter,

the Eleventh Circuit has not yet decided whether the "convincing mosaic" theory applies in the retaliation context. See Bailey v. Metro Ambulance Servs., 992 F.3d 1265, 1273 n.1 (11th Cir. 2021) (stating that the Court assumed without deciding that a convincing mosaic theory applies to a retaliation claim but found the claim failed regardless); James v. City of Montgomery, 823 F. App'x 728, 735 (11th Cir. 2020) (per curiam) ("Assuming, . . . but not deciding, that retaliation claims can survive summary judgment under a convincing-mosaic theory . . . "). Even assuming such a theory applies, however, Ms. Curet has not provided evidence that would support an inference that Ms. Lanza's decision to terminate Ms. Curet was retaliatory.

Under the convincing mosaic theory, a plaintiff can still proceed past summary judgment if she "presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision maker." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). "A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated

employees, and (3) pretext." Holley v. Ga. Dep't of Corr., 845 F. App'x 886, 890-91 (11th Cir. 2021). "In other words, a plaintiff must produce evidence 'sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" Key v. Cent. Ga. Kidney Specialists PC, No. 20-14351, 2021 WL 5321892, at *7 (11th Cir. Nov. 16, 2021) (citing Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000)).

Even under a convincing mosaic theory of retaliation, a plaintiff must still demonstrate that retaliation was the but-for cause of the employment action. See Bailey, 992 F.3d at 1274 ("And in line with his retaliation argument, Bailey (mistakenly) contended that the 'but for' standard is not a precondition under the convincing mosaic model.") (internal quotations omitted). "Ultimately, retaliatory intent is the crux of the matter, and "[w]hatever form it takes, if the circumstantial evidence is sufficient to raise a reasonable inference that the employer [retaliated] against the plaintiff, summary judgment is improper." Tolar v. Marion Bank and Trust, Co., 378 F. Supp. 3d 1103, 1120 (N.D. Ala. 2019) (citing Chapter 7 Trustee v. Gate Gourmet, Inc., 683 F.3d 1249, 1256 (11th Cir. 2012)).

Ms. Curet identifies a few events she alleges evince her managers' retaliatory animus, including: (1) inconsistent scheduling, (2) assignment of cleaning duties, and (3) issuance of written warnings.

These facts are not sufficient to "present a convincing mosaic of circumstantial evidence that would allow a jury to infer" that Ms. Lanza terminated Ms. Curet because of Ms. Curet's EEO activity. Smith, 644 F.3d at 1328. In particular, none of these events are related to Ms. Lanza's decision to terminate Ms. Curet based on her conduct during the September 18, 2019, meeting.

Although Ms. Curet identifies her issues with scheduling and assignment of cleaning duties as evidence of her managers' retaliatory motive, these issues predate her EEO activity. Ms. Curet made her first complaint to Ulta's hotline on March 4, 2019, alleging her managers discriminated against her by scheduling her unfavorably. (Doc. # 21-13 at 1). According to Curet, the issues with her schedule began as early as 2018. (Curet Depo. Doc. # 18-2 at 182:3–9). On April 11, 2019, Ms. Curet made another complaint alleging discrimination because of her schedule. (Doc. # 21-6 at 1). Because Ms. Curet's problems with her scheduling is the very issue forming the basis of her EEO activity, it does not support an inference

of retaliation. See Debe, 860 F. App'x at 641–42 (finding no causation where the allegedly retaliatory conduct predated the plaintiff's EEO activity). The March 2, 2019, incident where Ms. Curet was asked to take out the bathroom trash similarly predates her EEO activity. Likewise, Ms. Parsons' March 25, 2019, written warning to Ms. Curet occurred prior to Ms. Parsons becoming aware of Ms. Curet's EEO activity. (Doc. # 21-2 at 2).

Finally, Ms. Oliva's three written warnings against Ms. Curet are not germane to whether a retaliatory motive influenced Ms. Lanza's decision to terminate Ms. Curet. Ms. Oliva issued each of these warnings, without input from Ms. Lanza, concerning events unrelated to Ms. Curet's termination. See O'Neill v. Cotton Holdings, Inc., No. 1:18-cv-5713-ELR-CMS, 2020 WL 4668143, at *16 (N.D. Ga. July 1, 2020) (finding no convincing mosaic of discrimination where the evidence purporting to establish discriminating was "unrelated to [plaintiff's] termination decision"); Dcunha v. Circle K Stores, Inc., No. 2:13-cv-867-JES-MRM, 2015 WL 5440329, at *4 (M.D. Fla. Sept. 15, 2015) ("However, isolated remarks unrelated to the employment decision at issue are insufficient to establish discrimination.").

In sum, Ms. Curet has not established that retaliation was the but-for cause of Ms. Lanza's decision to terminate her employment. None of the evidence produced calls Ms. Lanza's reason for terminating Ms. Curet – that Ms. Curet slammed her hands down on the table during a meeting – into question. Ms. Lanza has not provided any inconsistent reasons for or ambiguous statements about Ms. Curet's termination, nor is there any evidence of other employees being disciplined less severely. Likewise, Ms. Lanza did not participate in any of the events that Ms. Curet alleges demonstrate a retaliatory animus. Because Ms. Curet's mosaic relies upon the conduct of parties unrelated to the decision to terminate her employment, it does not provide compelling evidence of retaliation.

For these reasons, Ulta's Motion for Summary Judgment is granted as to Count II.

### D.   **Count III – Race Discrimination**

As an initial matter, although Ms. Curet's initial complaint alleged race discrimination based on both her termination and her scheduling, Ms. Curet now argues only that her termination was based on race discrimination in her response to the Motion. (Doc. # 21 at 9). The Court thus only considers Ms. Curet's race discrimination claim with respect

to her termination, which Ulta does not contest constituted an adverse employment outcome. (Doc. # 18 at 23); see Solutia, Inc. v. McWane, Inc., 672 F.2d 1230, 1239 (11th Cir. 2012) ("There is no burden upon the district court to distill every potential argument that could be made based on the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

To survive summary judgment on a Title VII discrimination claim, the employee must produce sufficient evidence indicating that the employer acted with discriminatory intent. Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). She may satisfy this burden using either direct or circumstantial evidence, including by relying on the McDonnell Douglas framework. Lewis v. City of Union City, Ga., 918 F.3d 1213, 1220 (11th Cir. 2019).

However, as the Eleventh Circuit has explained, "establishing the elements of the McDonnell Douglas framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." Smith, 644 F.3d at 1328. Rather, "a plaintiff will always survive summary judgment if

he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." Id.

Here, Ms. Curet made no effort to formulate an argument under the McDonnell Douglas framework. (Doc. # 21 at 9). Since it is not the Court's responsibility "to cull through the record in search of evidence" to support an argument, it considers Ms. Curet's discrimination claim solely under the Smith convincing mosaic test. Freeman v. City of Riverdale, No. 1:06-cv-2230-WSD-LTW, 2007 WL 1129004, at *6 (N.D. Ga. Apr. 16, 2007).

Again, under the convincing mosaic test, a plaintiff can still proceed past summary judgment if she "presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision maker." Smith, 644 F.3d at 1328.

However, "[a] plaintiff cannot establish pretext sufficient to survive summary judgment simply by claiming the employer's stated reason for her termination is false; she must further establish there is a 'real' reason for her termination, i.e., discrimination . . . . [A]llowing a plaintiff to survive summary judgment would be inappropriate if the record conclusively revealed some other, non-discriminatory reason or if the plaintiff created only a weak

40

issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." Gibson v. JetBlue Airways Corp., No. 20-10943, 2021 WL 5368056, at *7 (11th Cir. Nov. 18, 2021) (internal quotations omitted). Further, "Title VII is neither a general civility code nor a statute making actionable the ordinary tribulations of the working place." Turner v. Fla. Prepaid Coll. Bd., 522 F. App'x 829, 833 (11th Cir. 2013). An employer singling out an employee and "treat[ing] her poorly," without more, "does not permit a jury to infer intentional discrimination based on race." Id.

As with her retaliation claim, Ms. Curet identifies a few events she alleges demonstrate her managers' discriminatory intent, including: (1) "hostile" facial expressions by her colleagues and managers, (2) inconsistent scheduling, (3) assignment of cleaning duties, (4) issuance of written warnings, and (5) her eventual termination.

These facts are not sufficient to "present a convincing mosaic of circumstantial evidence that would allow a jury to infer" that Ms. Lanza terminated Ms. Curet because of Ms. Curet's race. Smith, 644 F.3d at 1328. Ms. Curet presents no

evidence that the scheduling, assignment of cleaning duties, or issuance of warnings was racially discriminatory.

In particular, Ulta has explained that all employees were asked to leave before the end of their shift if they were not productive — not just Ms. Curet. (Doc. # 18-4 at ¶¶ 6, 10). Likewise, Ms. Curet's managers worked with her to schedule her during peak hours on Saturdays so that she could service more clients. (Doc. # 21-2 at 3). Although Ms. Curet's schedule was not always consistent, Ulta explained that her scheduling issues were due to Ms. Curet's low productivity and that filling her client book would allow her more control over her schedule going forward, which comports with industry standard. (Doc. # 21-6 at 1; Doc. # 21-2 at 3). And while Ms. Oliva's explanations for the September 13, 2019, written warning and September 18, 2019, reprimand may raise questions in the retaliatory hostile work environment context, they are not probative as to the ultimate question of whether Ms. Lanza's decision to terminate Ms. Curet was based on race discrimination.

Ms. Curet has not presented any evidence to suggest that Ulta's stated reasons for the scheduling, assignment of cleaning duties, or issuance of warnings were pretext for racial discrimination. While Ms. Curet identifies one

instance where she was asked to sweep the floor even though she was not the closing employee, this isolated instance is insufficient to support an inference of discrimination. Likewise, although Ms. Curet alleges that Ms. Oliva discriminated against her by asking her to clean the toilet, Ulta has presented evidence that managers asked at least one non-Hispanic, white employee to clean the toilet, negating any claim of "systematically better treatment of similarly situated employees." (Doc. # 21 at 14); Holley, 845 F. App'x at 891. The various instances where Ms. Curet was asked to perform cleaning tasks she believed to be outside the scope of her job responsibilities do not, without evidence of a discriminatory animus, support an inference of intentional discrimination. See Chambers v. City of Lakeland, No. 8:20-cv-2794-JLB-SPF, 2022 WL 2356816, at *5, *7-9 (M.D. Fla. June 30, 2022) (explaining that the assignment of additional work duties, without evidence that a protected characteristic motivated the assignment, did not create a convincing mosaic).

Further, while Ms. Curet's managers' "facial expressions" may not be model behavior, Title VII does not protect against "the ordinary tribulations of the working place." Turner, 522 F. App'x at 833. Poor treatment alone

43

does not justify an inference of intentional race-based discrimination. Id. Put differently, the fact that Ms. Curet's managers made faces at Ms. Curet's clients does not lend support for Ms. Curet's ultimate conclusion that she was terminated because of her race.

The facts here thus differ from those in cases where courts have found sufficient circumstantial evidence of discrimination. See, e.g., Jenkins v. Nell, 26 F.4th 1243, 1251 (11th Cir. 2022) (finding sufficient evidence to support an inference of discrimination where the employer made "racially-based comments"); Smith, 644 F.3d at 1336, 1345-46 (finding evidence of discrimination where an employer's spreadsheet for tracking disciplinary decisions included the employee's race in one column); Chapter 7 Trustee, 683 F.3d at 1256 (finding evidence of discrimination where a human resources director admitted that the employee's pregnancy was a "substantial or motivating factor" in the employer's decision to fire her). Ms. Curet has thus not presented any evidence, other than her conclusory allegations, that racial bias motivated her managers' actions. While the Court accepts for summary judgment purposes that Ms. Curet experienced some tension with her managers, such issues do not rise to the level of actionable discrimination. See Howard v. Wilkie, 421

F. Supp. 3d 1279, 1286–87 (S.D. Ala. 2019) (explaining that "unfair and rude" actions by an employer do not present a convincing mosaic of circumstantial evidence); McGhee v. PPG Industries, Inc., No. 4:18-CV-244 (CDL), 2020 WL 1669849, at *6 (M.D. Ga. 2020) (finding unfair treatment, without more, insufficient to support an inference of discrimination).

Furthermore, none of these events cast doubt on Ulta's stated reason for Ms. Curet's termination. "It is the plaintiff's burden not merely to raise a suspicion regarding an improper motive, but rather to demonstrate there is a genuine issue of material fact that the employer's proffered reason for his demotion was pretextual." Rioux v. City of Atlanta, 520 F.3d 1269, 1278 (11th Cir. 2008). The September 18, 2019, meeting between Ms. Curet, Ms. Oliva, and Ms. Parsons motivated Ms. Lanza's decision to terminate Ms. Curet. (Doc. # 18-4 at ¶ 18–20). Ms. Lanza relied on Ms. Oliva and Ms. Parsons' reports that Ms. Curet slammed her hands down on the table and raised her voice when making the decision. (Id. at ¶ 19). Even though Ms. Curet later disputed whether she actually raised her voice, she admitted to slamming her hands down on the table. (Doc. # 18-2 at 271:17–19). Ms. Lanza was entitled to terminate Ms. Curet based on Ms. Oliva and Ms. Parsons' reports of Ms. Curet's conduct.

Ms. Curet has provided no evidence to suggest that Ms. Lanza's reliance on Ms. Parsons and Ms. Oliva's reports was not in good faith, and thus she cannot show that the decision was a pretext for discrimination. See <u>Gogel</u>, 967 F.3d at 1148 (11th Cir. 2020) ("The relevant inquiry is therefore whether the employer in good faith believed that the employee had engaged in the conduct that led the employer to discipline the employee."). Regardless of Ms. Curet's issues with Ms. Oliva and Ms. Parsons leading up to her termination, Ms. Lanza was entitled to terminate Ms. Curet based on the reports of her behavior during the September 18 meeting. Ms. Curet has not presented any evidence suggesting racial discrimination was the true reason behind her termination.

In light of the evidence that Ms. Lanza relied on Ms. Curet's behavior during the September 18, 2019, meeting in deciding to terminate Ms. Curet, Ms. Curet has failed to satisfy her burden to show that Ulta's stated reasons were pretextual. Ulta's Motion for Summary Judgment is thus granted as to Count III.

## IV.   <u>Conclusion</u>

For the reasons given above, summary judgment is denied on Count I. The Motion is granted as to Counts II and III.

Accordingly, it is

**ORDERED, ADJUDGED, and DECREED:**

(1) Defendant Ulta Salon, Cosmetics & Fragrance, Inc.'s Motion for Summary Judgment (Doc. # 18) is **GRANTED** in part and **DENIED** in part.

(2) Summary judgment is granted in favor of Defendant on Counts II and III.

(3) Summary judgment is denied as to Count I.

**DONE and ORDERED** in Chambers in Tampa, Florida, this 26th day of September, 2022.

_____
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE